**ALASKA STEAMSHIP CO. v. MULLANEY, Commissioner of Taxation.**

No. 12,298.

United States Court of Appeals
Ninth Circuit
March 1, 1950

Bogle, Bogle & Gates, Frank L. Mechem, Seattle, Wash., Faulkner, Banfield & Boochever, H. L. Faulkner, Juneau, Alaska, for appellant.

J. Gerald Williams, Attorney General of Alaska, John H. Dimond, Asst. Atty. Gen., for appellee.

John Geisness, Bassett & Geisness, Seattle, Wash., as amicus curiae;

Sam L. Levinson, Edwin J. Friedman, Levinson & Friedman, Seattle, Wash., as amicus curiae;

Francis R. Kirkham, Harry R. Horrow, Frank H. Roberts, San Francisco, Cal., for Alaska Packers Assn., as amicus curiae. (Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel).

Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, I. Henry Kutz, Sp. Assts. to the Atty. Gen., (Mastin G. White, Solicitor, Dept. of Interior, Irwin W. Silverman, Chief Counsel, Div. of Territories & Island Possessions, Dept. of the Interior, Washington, D. C., of counsel), for United States as amicus curiae.

Before DENMAN, Chief Judge, ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellant operates a line of vessels for the transportation of freight and passengers between Seattle, Washington, and ports of Alaska. At the time to which this controversy relates, its 12 vessels were manned by 706 seamen all of whom were non-residents of Alaska. It also had 19 resident Alaska shore employees and some Seattle resident shore employees who made extended trips for the Company to Alaska.

On January 22, 1949, an extraordinary session of the Alaska legislature enacted a Net Income Tax Law, Laws 1949, Ex. Sess., c. 3, under the provisions of which the Steamship Company was required to withhold income tax from the wages of its employees. Because some doubt arose respecting the validity of the extraordinary session, the Alaska legislature on March 26, 1949, at its regular session, re-enacted the law with some changes. Laws 1949, c. 115. Section 16 of this Act purported to ratify and confirm all tax withholdings and other administrative steps taken under the former Act.

Appellant began the required withholding of the income taxes from wages paid to all its employees immediately after the enactment of the Act of January 22, 1949, the Act of the extraordinary session. Thereupon the employee members of the Sailors Union of the Pacific obtained an injunction from the United States District Court for the Western District of Washington, Northern Division, which enjoined the Steamship Company from paying any portion of the amounts so withheld to the Territory and required such amounts to be placed in a special fund subject to the further order of the court. After the second Act was passed by the regular session, the court extended the original injunction to the sums withheld under the new Act.

The Steamship Company thus found itself confronted with the demand of the appellee as territorial Commissioner of Taxation for payment of the amounts withheld and also with the injunction restraining such payment. The appellee had not been made a party and did not become a party to the injunction proceedings mentioned. The Steamship Company then brought this action for the purpose of testing the validity of the Alaska Act, alleging that its provisions requiring withholding from wages owing to vessel personnel were null and void and that the Act in its entirety was null and void and without legal effect. The prayer of the complaint was for an injunction restraining the appellee, as territorial Commissioner of Taxation, from collecting the amounts withheld by the Steamship Company from its vessel personnel and for a judgment determining that the entire Act as well as the withholding provisions thereof affecting vessel personnel were null and void. By supplemental complaint the prayer was expanded to ask for relief not only with respect to withholdings from persons employed as vessel personnel but with respect to all other employees of the Steamship Company. After answer filed and trial of the cause in the court below, the court made findings and conclusions in which it concluded that while the extraordinary session which enacted the Statute of January 22, 1949, was not constituted in accordance with law, and the Act of that date therefore invalid, yet the Act of March 26, 1949, was a valid Act which ratified and confirmed the tax withholdings made under the earlier Act. Accordingly, the temporary injunction which had been issued in this suit was vacated and the complaint was dismissed. Upon this appeal the

Steamship Company, asserting that in view of the situation in which it finds itself, it is entitled to question the validity of the Alaska Act, says that it should not be required to pay any of the sums heretofore withheld from the wages of its employees or make any further withholding, first, because the Act cannot validly require withholding from the wages of vessel personnel, and second, because the Act in its entirety is both outside the legislative powers of the Alaska legislature and unconstitutional and void upon its face. It is attacked as a denial of the equal protection of the law, as wanting in due process, and as constituting an unconstitutional burden on interstate commerce.

The sections of the Act to which it will be necessary to make special reference are set forth in the margin.[1] The general

1. Session Laws of Alaska 1949, c. 115, approved March 26, 1949, Alaska Net Net Income Tax Act:

Section 3. Definitions.

"A. In General: For the purpose of this Act—

"(8) The words "Internal Revenue Code" mean the Internal Revenue Code of the United States (53 Stat. 1) as amended or as hereafter amended.

\*　\*　\*　\*　\*　\*　\*

"B. References To Internal Revenue Code.

"(1) Whenever the Internal Revenue Code is mentioned in this Act, the particular portions or provisions thereof, as now in effect or hereafter amended, which are referred to, shall be regarded as incorporated in this Act by such reference and shall have effect as though fully set forth herein.

"(2) Whenever any portion of the Internal Revenue Code incorporated by reference as provided in Paragraph (1) of this subsection refers to rules and regulations promulgated by the United States Commissioner of Internal Revenue, or hereafter so promulgated, they shall be regarded as regulations promulgated by the Tax Commissioner under and in accord with the provisions of this Act, unless and until the Tax Commissioner promulgates specific regulations in lieu thereof conformable with this Act."

\*　\*　\*　\*　\*　\*　\*

"Section 5. Tax On Individuals, Fiduciaries, Corporations And Banks.

"A. General Rule. There is hereby levied and there shall be collected and paid for each taxable year upon the net income of every individual (except employees whose sole income in Alaska consists of wages or salary upon which tax has been withheld as referred to in subsection B of this Section), fiduciary, corporation and bank, required to make a return and pay a tax under the Federal income tax law, a tax computed by either one of the following methods:

"(1) a tax equal to 10 percent of the total income tax that would be payable for the same taxable year to the United States under the provisions of the Internal Revenue Code without the benefit of the deduction of the tax payable hereunder to the Territory.

"(2) a tax equal to 10 percent of that portion of the total income tax that would be payable under the provisions of the Internal Revenue Code without the benefit of the deduction of tax payable hereunder to the Territory, that gross receipts derived from sources within the Territory, payroll and value of tangible property located in the Territory, bears to the total gross receipts from sources within and without the Territory, payroll and value of tangible property within and without the Territory.

"(a) Determination Of Gross Receipts. Gross receipts from sources within the Territory shall consist of interest, rents, royalties, gains, dividends, all other income and gross income received or derived in connection with property owned or a business or trade carried on and salaries, wages and fees for personal services performed within the Territory. Income received or derived from sales wherever made of goods, wares and merchandise manufactured or originating in the Territory shall be considered to be a port of gross receipts from sources within the Territory.

"B. Employees. There is hereby levied upon and there shall be collected from every employee (including persons referred to in subsection (C) of Section 1621 of the Internal Revenue Code) whose sole income in Alaska during the taxable year consists of wages or salary, a tax in the amount of ten percent of the tax deducted and withheld under the provisions of sub-chapter (D), Chapter 9, of the Internal Revenue Code, which tax is to be withheld by the employer under the provisions of Section 8 of this Act.

\*　\*　\*

"(1) The tax levied by this subsection shall apply to that portion of the voyage pay of vessel personnel of interstate carriers engaged in the Alaska trade which is

scheme of the Alaska Act was to incorporate by reference the Internal Revenue Code of the United States "as now in effect or hereafter amended", by levying upon individuals, fiduciaries, corporations and banks, a tax equal to ten per cent of the income tax payable by the taxpayer for the same taxable year to the United States;

earned in the waters of Alaska, including the waters over the continental shelf. The tax shall likewise apply to that portion of the pay earned in Alaska of the personnel of carriers operating vehicles or airplanes on land or in the air on routes to and from Alaska."

\* \* \* \* \* \* \*

"Section 7. Returns And Payment Of Tax.

"A. Tax Returns. Every individual (except an employee whose sole income in Alaska during the taxable year consists of wages or salary upon which tax has been withheld), fiduciary, partnership, corporation and bank required to make a return under the provisions of the Internal Revenue Code, shall at the same time render to the Tax Commissioner a return setting forth: (1) the amount of tax and the balance of tax due or overpayment of tax as reported on returns made to the Collector of Internal Revenue; (2) the amount of tax due under this Act, less credits claimed against tax; (3) such other information for the purpose of carrying out the provisions of this Act as may be prescribed by the Tax Commissioner. The return shall either be on oath or contain a written declaration that it is made under the penalty of perjury, and the Tax Commissioner shall prescribe forms accordingly. The provisions of Sections 51, 52 and 53 of the Internal Revenue Code shall be adopted insofar as such provisions are consistent with other provisions of this Act.

"B. Payment Of Tax. The total amount of tax imposed by this Act shall be due and payable to the Tax Commissioner at the same time and in the same manner as the tax payable to the United States Collector of Internal Revenue under the provisions of Section 56 of the Internal Revenue Code.

"C. Federal Income Tax Return. Any taxpayer, upon request by the Tax Commissioner, must furnish to the Tax Commissioner a true and correct copy of any tax return which he has filed with the United States Collector of Internal Revenue. Every taxpayer must notify the Tax Commissioner in writing of any alteration in, or modification of, his Federal income tax return and of any recomputation of tax or determination of deficiency (whether with or without assessment). A full statement of the facts shall accompany this notice, which must be filed within twenty days after such modification, recomputation or determination of deficiency, and the taxpayer must pay the additional tax or penalty hereunder."

\* \* \* \* \* \* \*

"Section 8. Collection Of Income Tax At Source.

"A. Definitions. As used in this Section, with the exception of Federal government employees, the terms 'wages', 'payroll period', 'employee', and 'employer' shall have the meaning attributed to such terms by subsections (a), (b), (c) and (d), respectively, of Section 1621 of the Internal Revenue Code.

"B. Requirement Of Withholding. Every employer making payment of wages or salaries shall deduct and withhold a tax in the amount of 10 percent of the tax deducted and withheld under the provisions of subchapter (D), Chapter 9 of the Internal Revenue Code. Every employer making a deduction and withholding as outlined above, shall furnish to the employee upon request a record of the amount of tax withheld from such employee on forms to be prescribed, prepared and furnished by the Tax Commissioner."

\* \* \* \* \* \* \*

"Section 14. Administrative Powers.

"A. Tax Commissioner To Administer. The Tax Commissioner is hereby required to administer the provisions of this Act.

\* \* \* \* \* \* \*

"C. Rules And Regulations. The Tax Commissioner shall prescribe and furnish all necessary forms, and promulgate and publish all needful rules and regulations in plain and concise language conformable herewith for the assessment and collection of any tax herein imposed. He shall apply as far as practicable the administrative and judicial interpretations of the Federal income tax law. The Tax Commissioner shall also prepare a concise statement of the contents of the Code sections referred to herein for the information of the taxpayer and make the same available to the taxpayer making a return."

\* \* \* \* \* \* \*

"Section 15. Severability. If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of the Act and such application to other persons or circumstances shall not be affected thereby."

the taxpayer being given the option to pay a tax equal to ten per cent of that portion of his total federal tax which would be ascertained by application of an apportionment formula designed to determine the portion of the federal tax attributable to sources within and without the territory. With respect to those employees whose sole income in Alaska consists of wages or salary, the tax levied is an amount equal to ten per cent of the amount withheld by the employer under the federal Act, such ten per cent to be withheld by the employer for Alaska. With respect to the Alaska personnel of vessels engaged in Alaska trade, the tax levied was to apply to the portion of the voyage pay earned in the waters of Alaska. The administration of the Act and collection of the tax was delegated to the territorial Tax Commissioner. Rules and regulations promulgated by the United States Commissioner of Internal Revenue were to be regarded as regulations by the territorial Commissioner under the Act until the territorial Commissioner should promulgate specific regulations in lieu thereof. The Tax Commissioner was vested with a general authority to make and publish all necessary rules and regulations for the assessment and collection of any tax imposed by the Act and specifically empowered to promulgate apportionment rules and regulations. The Act contained a separability clause to the effect that if any provision of the Act be held invalid the remainder of the Act should not be affected thereby.

Counsel who represented the various Seamen's Unions in procuring the injunction mentioned, and counsel representing Alaska Packers Association, filed briefs as friends of the court in support of the appellant's attack upon the validity of the territorial Act. The United States, through the Attorney General, the Solicitor for the Department of the Interior, and the Chief Counsel for the Division of Island Possessions of the Department of the Interior, has filed a brief as amicus curiae in support of the position of the appellee. We now proceed to consider separately the various attacks made upon the Act in question.

1. That the Act of the special session was invalid because the session was not properly constituted, and withholdings from wages made under that Act were not validated by the Act of the regular session.

■■■ The trial court held that the extraordinary session of the territorial legislature which convened on January 6, 1949, and passed the first of the two acts here involved was not a lawfully constituted session of the legislature because it was composed in part of members who had been elected in October, 1948, but whose terms would not commence until the convening of the regular session of the legislature on January 27, 1949. Accordingly, it held that the original enactment of January 22 was invalid, but that since the invalidity went to the composition of the legislature, and not to its legislative powers, the Act of March 26, 1949, passed by the regular session could properly and did validly ratify, confirm and make valid the withholdings which had been made pursuant to the earlier Act. We consider it unnecessary to inquire into the validity of the earlier enactment, since the power of the legislature to levy a tax and make its operation retroactive cannot be questioned. Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87, 118 A.L.R. 1142. That this retroactive effect was accomplished through a ratification of an earlier invalid enactment would not, in our opinion, negative the power of the legislature to ratify and validate the questioned withholdings.

2. That the withholding provisions of the Act are invalid as applied to the wages of vessel personnel.

■■■ The only impact of the statute upon the Steamship Company of which complaint is made, is its withholding requirement. We do not understand that there is any question as to the right of the Company to raise the question of the statute's validity so far as its own employees are concerned. If the amounts required to be withheld cannot validly be deducted from the employees, then the Company would be liable to the employees for these amounts. We conclude that the Company has standing to challenge this aspect of the

statute, for the reasons stated for a similar conclusion in International Harvester Co. v. Dept. of Taxation, 322 U.S. 435, 64 S.Ct. 1060, 88 L.Ed. 1373. We think the matter is particularly clear here because the company is caught between the injunction of the District Court in the Western District of Washington and the demands of the appellee. And appellant's substantial interest is further pointed up by the fact that the ground on which it first attacks the withholding requirements is the claimed conflict of these provisions with federal statutes prohibiting all deductions from seamen's wages other than those expressly authorized. 46 U.S.C.A. §§ 591–605, 682–685.

[4] There is no contention that the seamen, as such, may not be made subject to a tax on that portion of their income earned in Alaska. The attack is upon the withholding provisions. This is stated in three ways. It is said that those Acts of Congress relating to the payment of seamen's wages in full without deduction, and free from attachment or assignment, are inconsistent with the provisions for withholding tax from seamen's wages. The sections of Title 46 U.S.C.A., referred to are Section 597, providing for payment of seamen's wages in full; Section 599, prohibiting advances and allotments of wages; Section 600, prohibiting stipulations whereby seamen may forfeit their lien; Section 601, prohibiting the attachment or arrestment or assignment of seamen's wages; and Section 605, providing for payment of wages of seamen without any deduction whatever. Cited is American-Hawaiian S.S. Co. v. Fisher, D.C., 82 F.Supp. 193, holding a similar withholding provision of the Oregon income tax law invalid on this ground. Another statement of the argument is that by the enactment of this legislation Congress has set up a comprehensive system of regulations for the payment of seamen's wages, and has thereby manifested an intention to assume complete control of this subject. It is said, therefore, that even if the Congressional enactments do not in express terms prohibit the withholding now called for by the Alaska Act, yet by implication all state or territorial action relating to wage payments to seamen is prohibited.

Finally, attention is called to the existence of a body of general maritime rules independent of any statutory enactment as exemplified by such cases as Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900; Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834, 11 A.L.R. 1145, and Washington v. W. C. Dawson & Co., 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646. It is said that one of the purposes of these rules is to establish, in the field of maritime law "harmonious and uniform rules applicable throughout every part of the Union." The existence of this body of law, it is said, constitutes an implied prohibition of any local enactment calling for withholding from seamen's wages. The contention is that "no statute of a state or territory can be valid if it prejudices the symmetry of the general maritime law." That such would be the practical effect of these withholding requirements, it is argued, becomes apparent when it is considered that if Alaska can do this so may the states, and in such event a seaman on a ship leaving Boston and traveling down the Atlantic Coast, through the Gulf, up the Pacific Coast, and on to Alaska, might have taxes withheld from his wages on behalf of several states as well as Alaska. It is contended this would impose a great burden on the seaman in making claim for excess withholding deductions, and the probability that all the tax laws would be different would not only add to that burden, but further destroy the uniformity which our system of admiralty jurisprudence was designed to maintain.

It must be agreed that the statutes referred to were enacted by Congress to protect seamen "who, as a class, are poor, friendless and improvident" and through the protection afforded by these acts to induce them "to accept employment in an arduous and perilous service",[2] that these

2. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993.

enactments took into account the fact that the seaman was unable "to cope effectively with his employer in bargaining",[3] and that it was sought to prevent voluntary or involuntary assignments "which would interfere with the remedy in admiralty for the recovery of his wages by condemnation of the ship".[4] We agree that in respect to legislation designed to accomplish these objectives Congress has occupied the entire field.

The cases dealing with state legislation extending workmen's compensation laws to seamen [5] expound the general policy, both of the Acts of Congress, and of admiralty law independently of statute, to assure uniformity in this field. We recognize that policy, and if we were dealing with a territorial act creating new rights, or altering old rights, as between the seaman and his employer, we would necessarily enforce it.

But here we must, perforce, recognize the existence of another policy, which in recent years has been increasingly given free rein by the Supreme Court. It is the policy of taking cognizance of the obligation of all men who depend upon the maintenance of law and order in a state or territory where they obtain income, or own property, to bear their fair share of the cost of supporting the government that protects them.

By the Organic Act Alaska has been granted the privilege of legislating, including the laying of taxes and the collection of revenue, in much the same manner as a state. And with respect to the states, it is recognized that the successful operation of our federal system can be accomplished only if the state legislature may have reasonable latitude in providing for the collection of revenue from those who are indebted to the state for a measure of protection. And while the state's taxing power must be exercised subject to the limitations set up by the due process and the equal protection requirements of the Constitution, the decisions of the Supreme Court indicate an increasing disinclination to strike down tax laws of the states on the basis of merely *implied* constitutional restrictions. Illustrative of this tendency are such cases as Graves v. People of State of New York ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927, 120 A.L.R. 1466, and Oklahoma Tax Comm. v. Texas Co., 336 U.S. 342, 69 S.Ct. 561, both overruling earlier decisions of the court. These decisions, we think, are illustrations of a general policy of non-interference with the effort of the states to collect taxes from sources within the states. Undoubtedly the United States is concerned with employing and compensating federal officers. The Graves case, supra, declined to imply from this a prohibition of a state tax on a federal officer's salary. The oil leases on Indian lands considered in the Oklahoma Tax Commission case, supra, were executed pursuant to the federal policy concerning the Indians, yet nothing about that policy precluded the state's power to impose a gross production tax on the lessee. Recognition of the state's power to tax was itself a policy entitled to respect.[6]

3. Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 342.

4. Wilder v. Inter-Island Navigation Co., 211 U.S. 239, 248, 29 S.Ct. 58, 62, 53 L. Ed. 164, 15 Ann.Cas. 127.

5. Southern Pacific Co. v. Jensen, supra, Knickerbocker Ice Co. v. Stewart, supra, State of Washington v. W. C. Dawson & Co., supra.

6. In Graves v. People of State of New York ex rel. O'Keefe, supra, 306 U.S. at page 486, 59 S.Ct. at page 601, 83 L.Ed. 927, 120 A.L.R. 1466, it was stated: "All the reasons for refusing to imply a constitutional prohibition of federal income taxation of salaries of state employees, stated at length in the Gerhardt case, are of equal force when immunity is claimed from state income tax on salaries paid by the national government or its agencies." In the Gerhardt case, Helvering v. Gerhardt, 304 U.S. 405, 420, 58 S.Ct. 969, 975, 82 L.Ed. 1427, the court said: "The taxpayers enjoy the benefits and protection of the laws of the United States. They are under a duty to support its government and are not beyond the reach of its taxing power." If a similar statement would be made respecting the duty of an employee or officer of the United States, to pay an income tax to New York, as was thus suggested in the Graves case, we would consider it proper to say of

We think any policy to be implied would be one to preserve and recognize, not to strike down, the Territory's power to tax. We know of no Congressional enactment and of no express or implied policy opposed to Alaska's requiring seamen who earn money in Alaska to pay taxes on their incomes. If some plan other than withholding could be devised for collecting such taxes, we think no question could be raised respecting such a tax.

The withholding provisions here are merely a collection adjunct of an otherwise valid tax. We think no objective of Congress, whether evidenced by the express language of the statutes relating to seamen's wages, or implied from its occupation of this field of legislation, can be said to run counter to the policy which would recognize the taxing power of the Territory.

Admittedly these collection provisions work some hardship and produce annoyances. No one has yet devised a painless method of tax collection. The withholding device, though of but recent contrivance for use in collecting from wage earners, is so efficient for this purpose as to have become an essential aspect of any modern income tax law. When Congress, as we have said, occupied the field of legislation relating to the protection of seamen in the collection of their wages, it was not then entering any field relating to the liability of seamen for taxes, or the means of collecting such taxes. We deal here with a different field than that covered by the Congressional enactments. The payment of taxes is not included in those things from which Congress undertook to protect the seaman.

We think what the Supreme Court did with state unemployment insurance, as applied to maritime workers, in Standard Dredging Co. v. Murphy, 319 U.S. 306, 63 S. Ct. 1067, 87 L.Ed. 1416, furnishes the proper guide here. There the court said, 319 U.S. at page 309, 63 S.Ct. at page 1068, 87 L.Ed. 1416: "But in dealing with unemployment insurance 'exclusive federal jurisdiction' is not affected at all. Congress retains the power to act in the field, and in the meantime, federal courts have nothing to do with it. No principle of admiralty requires uniformity of State taxation."

3. The attack upon the Alaska Act "in its entirety".

Appellant says that since we must necessarily consider the question of the validity of the withholding requirements, that while we are at it we should have a look at the entire Act; that when we do we shall find it so shot through with invalid and unconstitutional requirements that we shall see that the Act is invalid "in its entirety", and therefore necessarily invalid as to seamen.

The Steamship Company then proceeds to list numerous respects in which it claims that the Act either violates constitutional restrictions, or contravenes the limitations of the Organic Act.[7] First objection

these seamen that they enjoy the benefits and protection of the laws of Alaska, that they are under a duty to support its government, and are not beyond the reach of its taxing power.

7. The respects in which it was argued in the lower court that the Act was invalid were summarized by the trial judge as follows: "(1) that the provision for the adoption of future amendments of the Federal Income Tax Law and the regulations thereunder constitutes a delegation of legislative authority to Congress and the Commissioner of Internal Revenue; (2) that the act is lacking in uniformity because a tax on income, being a property tax, cannot be graduated; (3) that the act burdens interstate commerce in the constitutional sense; (4) that payment of the tax is made a condition precedent to the right to carry on any business, including that in interstate commerce; (5) that the formula prescribed for the apportionment of the wages of plaintiff's nonresident seamen is discriminatory because it has not, in express terms, been made applicable to other nonresident employees of the plaintiff; (6) that the statute is void for indefiniteness and uncertainty because it fails to define the terms 'income' in Section 5A(2) (a), 'days in port' in the succeeding paragraph, and 'continental shelf' Section 5B (1); (7) that the withholding provision, so far as seamen are concerned, is in conflict with Section 601, Title 46 U.S.C.A., and therefore void; (8) that Section 7D of the Statute delegates legislative authority to the Tax Commissioner."

enumerated is that the Alaska Act, in adopting "the Internal Revenue Code of the United States (53 Stat. 1 [26 U.S.C.A. § 1 et seq.] ) as now in effect *or hereafter amended*", attempts to delegate legislative functions to Congress, which it is not permitted to do. Appellee suggests that even if the words we have italicized, "or hereafter amended", must be held to have attempted such an invalid delegation, yet that under Section 15 of the Act, which is the "separability" clause of the Act,[8] the objectionable phrase may be ignored, as invalid, without its affecting the validity of the remainder of the Act. It is pointed out that no amendments have been made in the Internal Revenue Code since the adoption of the Alaska Act, and hence, it is said, the present application of the Act involves no necessity of incorporating any subsequently adopted amendments.

A more formidable objection to our consideration of this and other contentions made by appellant is to be found in those general limitations which courts have imposed upon themselves in cases where they are asked to pass upon the constitutionality of statutes. "The Court [has] developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision."[9]

■ So far as this appellant is concerned, it is not now required to conform to any requirements resulting from Congressional amendments of the Internal Revenue Code adopted after the Alaska Act was enacted. We shall have occasion later in this opinion to consider whether the appellant, in respect to any tax exacted from it,

has been denied equal protection, or due process, or otherwise deprived of rights because of any lack of uniformity or equality, or on account of any improper classification. What appellant faces, therefore, are these rules stated in the often quoted words of Mr. Justice Brandeis in the Ashwander case, supra, as follows: "The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it' ", and "The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation." As Mr. Justice Cardozo put it, "The plaintiffs are not the champions of any rights except their own."[10]

We therefore proceed to consider the various arguments addressed to us, and urged as reasons why the Alaska Act must be held invalid, having constantly in mind the important bearing of both the presumption created by the separability clause and the rules of self-restraint to which we have just referred.

4. As to the claim of invalidity due to delegation of legislative powers.

■ What has been said sufficiently indicates the basis for our opinion that even if we were to hold the attempted incorporation by reference of amendments to the Internal Revenue Code to be adopted in the future were an invalid delegation, yet as of this day and hour appellant is not affected by any such amendments, for there have been none. The right to incorporate by reference provisions of the federal law "now in effect", cannot be questioned. Franklin v. United States, 216 U.S. 559, 568, 30 S.Ct. 434, 54 L.Ed. 615; Santee Mills v. Query, 122 S.C. 158, 115 S.E. 202,

8. Section 15. "Severability. If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of the Act and such application to other persons or circumstances shall not be affected thereby."
 Such a clause creates no more than a presumption of separability, Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L.R. 596. Even in the absence of such a clause, the Supreme Court has been inclined to find separability in state tax laws. Stern,

"Separability and Separability Clauses in the Supreme Court", 51 Harvard L.R. 76, at p. 90.

9. Brandeis, J., concurring, in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688, as quoted in Rescue Army v. Municipal Court, 331 U.S. 549, 568, 67 S.Ct. 1409, 91 L.Ed. 1666.

10. Henneford v. Silas Mason Co., 300 U.S. 577, 583, 57 S.Ct. 524, 527, 81 L.Ed. 814.

Featherstone v. Norman, 170 Ga. 370, 395, 153 S.E. 58, 70 A.L.R. 449; In re Burke 190 Cal. 326, 212 Pac. 193.

We do not overlook the fact that if the words "or hereafter amended" were dropped from the Act, what remains would, in the long run, be unworkable under the legislative scheme here devised, for if the federal income tax requirements were changed substantially by future amendments, it would be impossible, administratively, to calculate the Alaska income tax merely by dividing the tax shown on the federal return by 10. That is a hypothetical question which conceivably may never arise. Commonwealth v. Alderman, 275 Pa. 483, 487, 119 A. 551, 553.

We think it is far from clear that any invalid delegation is attempted. There are of course many cases which have held attempts by a legislative body to incorporate provisions into its enactments by reference to future acts or amendments by other legislatures, to be invalid. But where it can be said that the attempt to make the local law conform to future changes elsewhere it not a mere labor-saving device for the legislators, but is undertaken in order to attain a uniformity which is in itself an important object of the proposed legislative scheme, there are a number of precedents for an approval of this sort of thing. Reciprocal and retaliatory legislation falls in this category.[11] People v. Fire Ass'n of Philadelphia, 92 N.Y. 311, 44 Am.Rep. 380.[12]

Similarly the efforts of the states to take advantage, in their inheritance tax laws, of the 80 percent credit provision in the federal laws relating to Estate Tax, 44 Stat. 70, now 26 U.S.C.A. 813(b), have been carried out by simple reference to the federal estate tax law.[13] Brown v. State, 323 Mo. 138, 19 S.W.2d 12. Perhaps the best-known instance of action by Congress encompassing within its regulation the laws of states, then or thereafter enacted, was the Conformity Act, 17 Stat. 196, 197, referred to by Mr. Justice Holmes, dissenting, in Knickerbocker Ice Co. v. Stewart, supra, 253 U.S. at page 169, 40 S.Ct. at page 443, 64 L.Ed. 834, 11 A.L.R. 1145. There, also, making the procedure in common law actions conform to that prevailing in the states was a prime object of the legislation.

The effort of the Alaska legislature to make its territorial income tax machinery conform to the federal act, and to preserve and continue such conformity, makes sense. It makes for convenience to the taxpayer and for simplicity of administration. Cf. Underwood Typewriter Co. v. Chamberlin, 94 Conn. 47, 65, 108 A. 154, 160. A similar coordination has been recommended by students of income tax problems for adoption by the states generally.[14] Since the attainment of this uniformity was in itself a major objective of the Alaska legislature, in enacting that the local law must conform, the Alaska legislature, which alone could make this decision, was itself acting, and was not abdicating its

11. See Joseph R. Starr "Reciprocal and Retaliatory Legislation in the American States", 21 Minn.L.R. 371.

12. "Possibly we may get nearer the ultimate point of the objection urged. That would seem to be that, while the legislature might, by a series of separate acts, each passed because of a then existing foreign law, follow its changes, yet it cannot do so by one act which adopted and enacts such future and contingent mutations. This doctrine requires us to hold that a law, so framed as to follow and recognize the changes of foreign legislation, and thereby incorporate such changes into its own operation, is a delegation of the legislative power and therefore inadmissible. We have found

no authority for such a broad and general proposition." For a case contra, see Clark & Murrell v. Port of Mobile, 67 Ala. 217.

13. Thus, in Sec. 13442, California Revenue and Taxation Code, provides in certain cases for a "tax equal to the maximum State tax credit allowed by the Federal estate tax law".

14. Kassell, "No Uniformity in State Income Taxes—Why?" 87 Journal of Accountancy, 293, 296 (April, 1949); "Federal, State and Local Government Fiscal Relations", S.Doc. 69, 78 Cong. 1st Sess. pp. 417, 148–9, 452. Cf. Mermain, "Cooperative Federalism", 57 Yale L.J. 1, 18 (Nov. 1947).

functions, nor, in our opinion, making an invalid delegation to Congress.[15]

There are two other ways in which, it is asserted, an invalid delegation is made. One is the provision that "rules and regulations promulgated by the United States Commissioner of Internal Revenue * * shall be regarded as regulations promulgated by the Tax Commissioner under * * this Act." We think what we have said concerning incorporation of the Internal Revenue Code sufficiently disposes of this question. If the one is valid, the other is also.

Again it is said that the attempted delegation of authority to the territorial Tax Commissioner is invalid. We shall have occasion to discuss the problem of such delegation later in this opinion.

5. The constitutional and statutory limitations upon the territorial legislature.

Before proceeding with a discussion of other claims of invalidity in the Alaska Act it is essential that we notice what specific restrictions limit the Alaska legislature's power. We are confronted with claims of invalidity because of lack of equality and uniformity, and on account of alleged arbitrary and unreasonable classifications. It is also asserted that the Act attempts to tax that which is beyond the Territory's jurisdiction; that it is therefore wanting in due process.

Under the Organic Act (37 Stat. 512, 48 U.S.C.A. Sec. 21, et seq.) the territorial legislature "has the full power of taxation", Alaska Fish Salting & By-Products Co. v. Smith, 255 U.S. 44, 49, 41 S.Ct. 219, 220, 65 L.Ed. 489. Its power to tax has been referred to as an "unlimited power expressly given". Pacific American Fisheries v. Territory of Alaska, 269 U.S. 269, 277, 46 S.Ct. 110, 70 L.Ed. 270. The inquiry is as to what express limitations control this taxing power.

We know that the Constitution followed the flag to Alaska. Rasmussen v. United States, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862. It has been said that the Fourteenth Amendment has no application to a territory. South Porto Rico Sugar Co. v. Buscaglia, 1 Cir., 154 F.2d 96, although the contrary was apparently assumed in Alaska Fish Co. v. Smith, supra, and in W. C. Peacock & Co. v. Pratt, 9 Cir., 121 F. 772. But the Organic Act, enacted in 1912, provides: "The Constitution of the United States, and all the laws thereof which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States. * *" 48 U.S.C.A. § 23.[16]

It therefore appears that whether we were to hold that the Fourteenth Amendment applies to Alaska in the same way, and for the same reasons that the Fifth Amendment does, or whether the limitations stated in this amendment have been made applicable to territorial legislation by this section of the Organic Act, the tests and standards to be applied are the same. Again, the provision of the Organic Act that "all taxes shall be uniform upon the same class of subjects and shall be levied and collected under general laws, and the assessments shall be according to the true and full value thereof * * *." 48 U.S.C.A. § 78, if it has application to anything other than ad valorem property taxes, requires no greater measure of uniformity and equality than does the equal protection

---

15. It would appear that the intended administrative simplicity of the Act is somewhat impaired by the inclusion of the words "as computed without the benefit of the deduction of the tax payable hereunder to the Territory", in Section 5A(1) and (2). Since the federal law would permit such deductions, it would seem that the federal returns would have to be recomputed in each case to meet this requirement before the 10 percent could be applied.

16. The Civil Rights Act, 8 U.S.C.A. § 41, provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

See County of San Mateo v. Southern Pacific R. Co., C.C., 13 F. 145.

requirement of the Fourteenth Amendment. Fox v. Standard Oil Co., 294 U.S. 87, 102, 55 S.Ct. 333, 79 L.Ed. 780. See Ballester-Ripoll v. Court of Tax Appeals of P. R., 1 Cir., 142 F.2d 11, certiorari denied 323 U.S. 723, 65 S.Ct. 55, 89 L.Ed. 581.

We therefore approach the arguments made with respect to alleged inequality, arbitrary classifications, and attempted impact on incomes received outside Alaska with the assumption that the validity of the Act must be judged by the same standards of due process and of equal protection that would be applied in the case of similar legislation by a state, subject of course to the requirement we have mentioned that the person challenging must show himself affected by the provision alleged to be invalid.

6. The criticized classifications of the Act.

■ Appellant points to a number of respects in which it is said the Act makes discriminations and classifications so arbitrary, and so wanting in reason to support them, as to disclose an invalidity upon the face of the Act.

In the first place it is said the territorial legislature was without power to pass a graduated income tax. What we have said indicates our conclusion that its general power in this direction is no less than that of a state. We regard this question as too well settled to require extended discussion. A graduated tax does not necessarily involve arbitrary classification. Brushaber v. Union Pacific R. Co., 240 U.S. 1, 36 S. Ct. 236, 60 L.Ed. 493, L.R.A.1917D, 414, Ann.Cas.1917B, 713. Graduated income taxes, involving as they do the concept of ability to pay, are based upon "intelligible grounds of policy". Pacific Fisheries v. Alaska, supra, 269 U.S. at page 278, 46 S.Ct. at page 112, 70 L.Ed. 270.

■ It is next asserted that the Act makes invalid discriminations between taxpayers in that some will have had unused net operating loss deductions under Section 122 of the Internal Revenue Code, 26 U.S.C.A. § 122, and some will have unused capital losses under Section 117, and that such taxpayers can carry those losses forward to their 1949 federal tax computation. In their cases, since the Alaska tax for 1949 is a percentage of the federal tax, they will pay a less tax that year than other taxpayers, with the same 1949 income, solely because of losses incurred by them before the Alaska Act was enacted. It is asserted that this is an arbitrary discrimination. Wholly apart from the fact that it does not here appear that any such cases actually exist, and that appellant does not show itself to be adversely affected by such alleged discrimination, we think it cannot be said that such a distinction, even if it actually develops, is an arbitrary one. "In taxation, even more than in other fields, legislatures possess the greatest freedom in classification." Madden v. Commonwealth of Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590, 125 A.L.R. 1383. And in a field of taxation where it is recognized that classifications may validly be grounded upon ability to pay, we think a distinction which recognizes losses incurred even before the effective date of the Act, is not without reasonable basis.

■ The third respect in which it is claimed there is arbitrary discrimination is the failure of the Act expressly to state a formula for apportionment of the wages earned by the employees of appellant, and of others, who are not vessel personnel. By Section 5B(1) the tax is made to apply only "to that portion of the voyage pay of vessel personnel of interstate carriers * * * which is earned in the waters of Alaska * * *." There is no similar provision relating to appellant's shoreside employees. It is asserted that a non-resident, non-vessel employee would be subject to a tax equal to one-tenth of the amount withheld under the federal law, with no allowance for the fact that only a portion of his wages might be earned in Alaska. A non-resident employee, whose earnings outside Alaska were taxed along with his Alaska earnings, might well complain that the attempted tax was wanting in due process. No such employee is a party to this suit. It is not too clear that any such person is affected by it. By a so-called "Supplemental Complaint", the relief sought by the original complaint with

respect to the withholdings from the pay of vessel personnel was expanded to cover all other persons employed by the Steamship Company. The findings disclose the withholding of a specified sum from "nineteen resident Alaska employees who are agents, assistant agents and shore employees". There is no finding as to any non-resident shore employees. No error is assigned with respect to this particular finding, although it would appear from the testimony given that the sum mentioned was the amount withheld from all non-vessel employees including the nineteen residents, and an unnamed number of non-residents.

So far as the resident employees are concerned, no apportionment is required. New York ex rel. Cohn v. Graves, 300 U.S. 308, 57 S.Ct. 466, 81 L.Ed. 666, 108 A.L.R. 721. We cannot, on this record, segregate the amount paid to non-resident non-vessel employees. Nor can we speculate as to what portion, if any, of their wages were earned outside Alaska. Whatever their rights may be, we cannot on this record find the Alaska Act void "in its entirety", as we are asked to do.

Even if the facts before us were sufficient to disclose a withholding, for the Alaska tax, of a tax on account of the portion of a non-resident's wages earned elsewhere, yet the Act is not without devices for relieving such employee of that part of his tax. The last proviso of the first paragraph of Section 5B provides that although employees whose sole income in Alaska consists of wages or salary need not file a return, yet such an employee may do so "for the purpose of getting his liability fixed in accordance with the rate of tax imposed by the general rule, and making claim for refund of any overpayment." The rate of tax under this "general rule", would be that provided by Section 5A with its provisions and machinery for apportionment. It would doubtless be awkward and cumbersome for such employees to have to file returns to secure their proper refunds, but it would appear that the power granted the territorial Tax Commis-

sioner to "promulgate proper apportionment rules and regulations conformable with this Act" and to "prescribe and furnish all necessary forms, and promulgate and publish all needful rules and regulations" is adequate to permit great simplification of the employees' returns and of the refund procedure.

The fourth respect in which it is claimed that the Act both denies equal protection and is wanting in due process is the manner in which the apportionment formula of Section 5A(2) would be applied to certain corporations and individuals doing a multi-state business. Under Section 5A the taxpayer may elect to pay a tax equal to 10 percent of his federal tax. Or, if he desires the benefit of an apportionment formula, he may, under subdivision (2), pay 10 percent of an allocated portion of his federal income tax. It apportions to Alaska that portion of a taxpayer's federal income tax which "gross receipts derived from sources within the Territory, payroll and value of tangible property located in the Territory, bears to the total gross receipts from sources within and without the Territory, payroll and value of tangible property within and without the Territory."

Appellant does not find fault with this portion of the formula. Its brief says: "As so constituted we think the allocation formula is a valid one, having received wide recognition elsewhere", citing Spector Motor Service, Inc. v. Walsh, 2 Cir., 139 F.2d 809.[17] Very similar apportionment formulas have been sustained by the Supreme Court. Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991.

But the section does not leave the formula there, but proceeds, in subdivision (2)(a) under the heading of "Determination of Gross Receipts", (see footnote 1, supra) after listing "interest, rents, royalties, gains, dividends, all other income and gross income received or derived in connection with property owned or a business or trade carried on" within the ter-

17. Reversed on other grounds, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101.

ritory, as follows: "Income received or derived from sales wherever made of goods, wares and merchandise manufactured or originating in the Territory shall be considered to be a part of gross receipts from sources within the Territory."

It is said that in the case of a corporation in the fisheries business, which engages in fishing and canning in Alaska, then transports the product to Seattle where it is boxed, labeled, and stored, with a sales organization in Chicago, the income received from the final sales would represent income from many sources outside Alaska, and the requirement that all the income from such sales be considered as "receipts from sources within the Territory", would operate to impose a tax which was beyond the Territory's authority, and wanting in due process. It is said that this infirmity in the Act appears on its face, and that for this stronger reason the Act is bad under the principles laid down in Hans Rees' Sons v. State of North Carolina, 283 U.S. 123, 51 S.Ct. 385, 75 L.Ed. 879. It is also urged that, so applied, the apportionment formula will impose a burden on interstate commerce in violation of the interstate commerce clause of Article I of the Constitution. Section 8, cl. 3.

The qualifying language which assigns to the Territory income received from sales wherever made of goods manufactured or originating in the Territory, resembles somewhat similar provisions adopted in New Mexico and Virginia.[18] This portion of the New Mexico allocation formula was said to be invalid as applied to foreign corporations in the case cited in the last footnote.

In answer to these contentions and in support of the Act, attention is called to section 5A(2)(c) which provides that where the allocation formula stated in the Act would charge the taxpayer with a "larger tax than in equity and good conscience he should have been required to pay", then a different allocation and apportionment may be provided by the Tax Commissioner.[19] It is said that when a foreign corporation or non-resident taxpayer appears and discloses that the application of the provision here complained of will operate to draw within the orbit of the Alaska tax income which is not properly within the jurisdiction of the territory, the provisions for relief and reapportionment by the Tax Commissioner found in section 5A(2)(c) will operate to relieve the taxpayer from the application of what otherwise might be an invalid formula.

To this argument the appellant and those friends of the court who are here in support of this portion of its arguments reply that the section "offends the most elementary principles forbidding the delegation of legislative powers" and cite the Panama Refining Company and Schechter Corp. cases.[20]

We think that even if the appellant were in a position to complain of the portion of the allocation formula attributing all such sales of goods originating in Alaska to the territory, we should not be inclined to accept the argument made as to the invalidity of this delegation of power to the Tax Commissioner. Many states in setting up apportionment formulas have found it expedient to provide similar escape clauses whereby in cases of hardship the taxpay-

18. N.M.Stat.Ann. Sec. 76-1231(b), New Mexico Glycerine Co. v. Gallegos, 48 N. M. 65, 145 P.2d 995; Va.Code Ann. § 54, Tax Code 1942, Virginia Code of 1950, Secs. 58-132.

19. "Apportionment of Tax by Tax Commissioner. If the taxpayer, upon petition to the Tax Commissioner, as provided in Section 13 of this Act, conclusively demonstrates that because of other factors, the method of allocation hereinabove provided, results in a larger tax than in equity and good conscience he should have

been required to pay, then the tax shall be determined, allocated and apportioned under such processes and formulas as the Tax Commissioner shall provide, and the Tax Commissioner may promulgate proper apportionment rules and regulations conformable with this Act for general application in similar cases."

20. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 83, 79 L.Ed. 645; Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L. R. 947.

er may be relieved from a rigid statutory formula and hence provide for some system of "equitable apportionment". See Silverstein "Problems of Apportionment of Taxes in Multistate Business", 4 Tax Law Review 207 at page 220.[21] In United Advertising Corp. v. Lynch, 2 Cir., 63 F.2d 243, 245, the court considered a similar delegation of power to the New York Tax Commission which was attacked on the ground that it was "indefinite and permits an arbitrary, discriminatory, and unequal assessment of taxes". The court said: "This, we think, is a valid method of assessing and imposing a tax." [22]

While the Court of Appeals for the Second Circuit thus assumed the validity of the section of the New York law there referred to, the New York Court of Appeals in People ex rel. B. P. Ducas Co. v. State Tax Commission, 260 N.Y. 525, 184 N.E. 77, 78, treated the same section prior to its amendment in minor particulars as "too vague to state a workable rule." This case was followed in People ex rel. Schulter & Co. v. Lynch, 264 N.Y. 680, 191 N.E. 624. On the other hand, comparable grants of authority to state tax officials have been upheld in Western Union Telegraph Co. v. Query, 144 S.C. 234, 142 S.E. 509, and in State Revenue Commission v. Edgar Bros. Co., 185 Ga. 216, 194 S.E. 505, against the contention of the taxpayers that there was an unconstitutional delegation of legislative power.

We do not think that the question of the validity of the attempted delegation of power can be disposed of solely by consideration of such cases as Panama Refining Co. v. Ryan, supra, and Schechter Corp. v. United States, supra. The first of those cases illustrates what happens when no standard whatever is prescribed for the exercise of the delegated power; the second was a case in which, although standards were prescribed, they were too vague and the authority to apply them extended to the entire country and to all industry.

But where the authority to deal with the situation relates to a single subject that has its own natural limits and boundaries, the situation is quite different. Thus, in New York Central Securities Co. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, the stated criterion to be applied by the Interstate Commerce Commission was the "public interest". In sustaining the Act of Congress there involved, the Supreme Court said 287 U.S. at pages 24, 25, 53 S.Ct. at page 48, 77 L.Ed. 138: "It is a mistaken assumption that this is a mere general reference to public welfare without any standard to guide determinations. The purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary. * * * the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred. So far as constitutional delegation of authority is concerned, the question is not essentially different from that which is raised by provisions with respect to reasonableness of rates, to discrimination, and to the issue of certificates of public convenience and necessity."

Whether a grant of authority to an administrative official is an invalid delegation of legislative authority, is not to be judged by the mere words used in the text of the delegation. It must be judged after a consideration of the purposes of the whole Act, the natural and necessary limitations for administrative action, and the boundaries which historically have been attached to and enforced in the exercise of such power. The main question is, as pointed out in Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 648, 88 L.Ed. 892,

---

21. Cf. Watson, "Allocation of Business Income for State Income Tax Purposes", 25 Minn.Law Review, 851, at p. 906.

22. The tax there referred to was said in Bass, etc., Ltd. v. Tax Comm., 266 U.S. 271, 280, 45 S.Ct. 82, 83, 69 L.Ed. 282, to be a franchise tax levied "for the privilege of doing business in the State."

whether "here, as in the Yakus case, the standards prescribed by the Act are adequate for the judicial review which has been accorded."

All of this must be judged in the light of what is practical. As stated in Bowles v. Willingham, supra, 321 U.S. at page 515, 64 S.Ct. at page 647, 88 L.Ed. 892: "In terms of hard-headed practicalities Congress frequently could not perform its functions if it were required to make an appraisal of the myriad of facts applicable to varying situations, area by area throughout the land, and then to determine in each case what should be done. Congress does not abdicate its functions when it describes what job must be done, who must do it, and what is the scope of his authority. In our complex economy that indeed is frequently the only way in which the legislative process can go forward."

The necessity of taking all these things into consideration was pointed out in American Power Company v. S.E.C., 329 U.S. 90, 104, 67 S.Ct. 133, 142, 91 L.Ed. 103: "Even standing alone, standards in terms of unduly complicated corporate structures and inequitable distributions of voting power cannot be said to be utterly without meaning, especially to those familiar with corporate realities. But these standards need not be tested in isolation. They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear."

Here we think the taxpayer is not left without standards adequate for the judicial review afforded by the Act. The constitutional limits and restrictions with which apportionment and allocation formulas are hedged about have been the subject of discussion in the courts for many years. The multi-state businesses which constitutionally may be required to pay the income tax to Alaska are undoubtedly as varied in their organizations and types of business as the almost numberless varieties of business organizations with which the courts have had to deal in passing upon the validity of tax laws within the states. Necessarily the territorial legislature could not prescribe the exact alternate formula for every organizational variation, but when the Tax Commissioner, upon a showing of the impropriety of the statutory formula, proceeds by rule to prescribe an equitable apportionment, he must do so within those narrow limits which are hedged about by the standards of due process with which the courts have been concerned for many years. Cf. Fahey v. Mallonee, 332 U.S. 245, 250, 67 S.Ct. 1552, 91 L.Ed. 2030. We think that under these circumstances the principles expounded in the New York Central Securities Co. case, supra, the Willingham case, supra, and the American Power Company case, supra, all sustain the attempted delegation here.

Because of the importance of the questions here raised to the administration of an important revenue measure in Alaska, we have chosen to place our decision on this aspect of the case upon this ground, which was that adopted by the trial judge, rather than upon the more narrow ground, which we think is equally valid, that this appellant, not being adversely affected by the portion of the Act which we have just dealt with, is in no position to make this specification in attacking its validity.[23]

23. Another aspect of the problem of allocation of income which appellant is not in a position to urge on this record, stems from the fact that the apportionment formula is applied, not to the taxpayer's income, but to his federal income *tax*. Section 5A(2) refers to a portion "of the total income tax that would be payable under the provisions of the Internal Revenue Code". Because of the federal surtax provisions this means that the Alaska tax will itself be a graduated one. In the case of a taxpayer with income from sources outside, as well as in Alaska, if he finds himself in certain high brackets that will be not because of the amount of the Alaska income, but by reason of the aggregate of the taxpayer's income everywhere. The problem relates to nonresident taxpayers. Compare two individuals, each with $5,000 in Alaska income but one with $95,000 income elsewhere, and the other with $1,000 elsewhere. It is clear that the tax on the first taxpayer will be three times that on the second, although both receive the same amount of income in Alaska. What is more, the higher brackets in the one case are at-

■ Even if we were prepared to accept appellant's argument that we should, because of apparent unconstitutional provisions, condemn the Act "in its entirety", we cannot here dispose of the whole Act merely because of the inclusion in the apportionment formula of the provision that income form sales wherever made of goods originating in the Territory are to be considered receipts from sources within the Territory, and strike down the entire Act in view of the Act's separability clause. Should the whole sentence to which the attack on this aspect of the case is directed be held invalid and unenforceable, the remainder of the Act and its apportionment formula would still provide a workable Act.[24]

■ 7. The question whether the Act creates a burden on interstate commerce.

tributable to the taxpayer's activities outside Alaska.

A comparable situation appeared in Maxwell v. Bugbee, 250 U.S. 525, 40 S.Ct. 2, 63 L.Ed. 1124. That case upheld a New Jersey inheritance tax statute, which provided for a progressive tax, not graduated in relation to the New Jersey property alone, but in reference to the decedent's entire estate.

The argument against the scheme of taxation there involved was stated by Mr. Justice Holmes for the four members of the court who dissented. He said: "It seems to me that when property outside the State is taken into account for the purpose of increasing the tax upon property within it, the property outside is taxed in effect, no matter what form of words may be used." Nevertheless, we know of nothing since the date of that decision to lessen its authority, or to suggest that its rule would not be applied to an income tax like the one before us. See Lowndes, "Rate and Measure in Jurisdiction to Tax—Aftermath of Maxwell v. Bugbee", 49 Harvard Law Review 756. In effect what is done here is to ascertain the taxpayer's Alaska income by the apportionment formula, and then apply to that Alaska income, a rate based on his entire income wherever derived.

Maxwell v. Bugbee was cited with approval, and relied upon, in Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293, relating to the Louisiana chain store tax. Because the classifications there were held to be justified by differences other than mere ability to pay, we think the Atlantic & Pacific Tea Co. case does not help here. Here the classifications are based upon ability to pay, regardless of the source of the ability.

Actual experience with the Act's system of allocation may demonstrate a reasonable degree of fairness, which would negative any inference of attempt to do other than tax the local income. Honest efforts to make apportionments are not nullified because of mere want of mathe-

matical exactness. International Harvester Co. v. Evatt, 329 U.S. 416, 423, 67 S.Ct. 444, 91 L.Ed. 390. If the individual mentioned, with income of $100,000, collected it in nineteen different states as well as in Alaska, and in substantially equal portions, and if all jurisdictions copied the Alaska tax, his total tax would be no more than that of an individual with the same total income, all of it in Alaska. While the state of domicile might tax upon the whole income, that possibility is always present in any case of this type. It should not serve as a reason for limiting other taxing jurisdictions. The fact that the consequences of this feature of the law are so unpredictable serves to point up the reasons why a court should not "anticipate a question of constitutional law in advance of the necessity of deciding it."

24. In the supposititous case of the outside corporations engaged in the fisheries business which we have mentioned above, the deletion of this sentence from the Act would probably produce for Alaska a much less tax return than it might justly claim in view of the major importance of the fisheries end of such a business. For if sales remain a factor in the formula applied, it is apparent that substantially all of the sales of such company would be outside of the territory, thus making the apportionment fraction a very minor one. It would appear that in such case a more equitable result would be reached by eliminating the sales or gross receipts item entirely and applying a formula based solely on the payroll and tangible property. Cf. Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 41 S.Ct. 45, 65 L.Ed. 165, where the taxpayer carried on its manufacturing in Connecticut where the profits received were only $43,000 as compared with $1,300,000 in other states. An apportionment based on real estate and tangible personal property produced a percentage of 47, and 47% of the total net income was attributed to Connecticut and sustained by the court.

The argument upon this point takes two forms. It is first said that Section 12C, in providing as a penalty for non-payment of the tax that "any person authorized to conduct any business by virtue of a license duly issued to him under the laws of Alaska, whether he be a resident or not, shall * * * suffer suspension of his said license or licenses until the tax imposed by this Act together with penalties is paid in full" has a direct impact upon the taxpayers engaging in interstate commerce. It is said that in practical effect this creates a tax upon the privilege of doing interstate business within the Territory, a tax which may not validly be imposed.

We think the short answer to this argument is that in the very nature of the case a license issued by Alaska could only be a license to do intrastate business. It could not be assumed that Alaska would undertake to license the doing of an interstate business. Bowman v. Continental Oil Co., 256 U.S. 642, 41 S.Ct. 606, 65 L.Ed. 1139; Cooney v. Mountain States Tel. Co., 294 U.S. 384, 55 S.Ct. 477, 79 L.Ed. 934. This particular penalty therefore has no relation to any taxpayer's interstate business or any taxpayer which does no business other than interstate business. We agree with the statement of the trial court that "The objection that Section 12C makes the payment of the tax a condition precedent to the right to carry on any business, including that in interstate commerce, is not reasonably susceptible of such a construction". In any event no license belonging to appellant is proposed to be suspended and the question is therefore hypothetical and not here for decision.

The remainder of the argument with respect to a claimed burden on interstate commerce is based upon the contention that the classifications provided for by the Act and the discriminations made are so arbitrary and unreasonable as in effect to make the tax one levied upon the privilege of doing interstate business.

If what we have heretofore said is correct, there is no basis in the record for an assertion that the tax is either wanting in due process of law or that it denies the equal protection of the law. We find nothing in the Act, which singles out for special treatment interstate commerce or those who are engaged in interstate commerce because and on account of such commerce. This portion of the argument is therefore foreclosed by what was said in Underwood Typewriter Co. v. Chamberlain, 254 U.S. 113, 119, 120, 41 S.Ct. 45, 46, 65 L.Ed 165, as follows: "A tax is not obnoxious to the commerce clause merely because imposed upon property used in interstate commerce, even if it takes the form of a tax for the privilege of exercising its franchise within the state. * * * This tax is based upon the net profits earned within the state. That a tax measured by net profits is valid, although these profits may have been derived in part, or indeed mainly, from interstate commerce, is settled."

Our examination of the Act and the record before us fails to disclose any respect in which we can observe an impact of the proposed tax which would constitute a burden on interstate commerce within the meaning of the decisions of the Supreme Court.[25]

With respect to the manner of graduating the tax mentioned in footnote 23, it will be a proper time to deal with the question of burdening interstate commerce when someone adversely affected by this feature

25. "Certain types of tax may, if permitted at all, so readily be made the instrument of impeding or destroying interstate commerce as plainly to call for their condemnation as forbidden regulations. Such are the taxes already noted which are aimed at or discriminate against the commerce or impose a levy for the privilege of doing it, or tax interstate transportation or communication or their gross earnings, or levy an exaction on merchandise in the course of its interstate journey. Each imposes a burden which intrastate commerce does not bear, and merely because interstate commerce is being done places it at a disadvantage in comparison with intrastate business or property in circumstances such that if the asserted power to tax were sustained, the states would be left free to exert it to the detriment of the national commerce." McGoldrick v. Berwind-White Co., 309 U.S. 33, 48, 60 S Ct. 388, 393, 84 L.Ed. 565, 128 A.L.R. 876.

of the statute appears to claim that in respect to him it operates to discriminate against such commerce in favor of intra-territorial commerce. On the face of the Act the classification mentioned appears to have no such cleavage. In any event we are of the opinion that this appellant has not produced a record requiring us to pass upon the claim of a burden upon interstate commerce in any of the respects mentioned by it.

It is contended that the Act is void for uncertainty. The main cause for the alleged uncertainty is the provision of the Act relating to future amendments of the federal law. What we have heretofore said upon that subject sufficiently discloses the reasons why we think that the point here made is without merit.

It is asserted that the reference, in Section 5B(1) to "the waters over the continental shelf", was to something lacking precise definition, and therefore uncertain. With this the trial judge agreed, holding that this clause "may be eliminated without affecting the remainder of the act." In this we think he was right. We think the other terms of the act of which complaint is made on the score of alleged uncertainty, are not subject to this objection.

We are of the opinion that the judgment of the Court below must be affirmed.

It is so ordered.

DENMAN, Chief Judge, concurring in the result and in part of the opinion:

I concur save as to the holding that the Commissioner's power of apportionment, described in note 19 of the opinion, to reduce the tax if it is "larger * * * than in equity and good conscience" the taxpayer should pay, makes valid the provision of Section 5A(2) (a) that 'Income received or derived from sales wherever made of goods, wares and merchandise manufactured or originating in the Territory shall be considered to be a part of gross receipts from sources within the Territory."

The appellant's complaint does not claim any amount of its income is of the kind described in the last quoted section, and it is not proved that there is such income.

The constitutional question of the power of the territory to tax extraterritorial income should be decided only when that issue is before the court. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346, 56 S. Ct. 466, 80 L.Ed. 688.